-FILED-
NOV 15 2023
At ______ M
Chanda J. Berta, Clerk
U.S. DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CASE NO. 2:23CR112 |
| | ) | |
| v. | ) | |
| | ) | 18 U.S.C. § 1347 |
| LISA GUZMAN | ) | 18 U.S.C. § 2 |
| | ) | |

# INDICTMENT

THE GRAND JURY CHARGES:

At times material to this indictment:

## Background

1. LISA GUZMAN, a resident of Hammond, Indiana, was a nurse practitioner licensed to practice in Indiana and elsewhere. GUZMAN was a Medicare provider and was required to abide by all Medicare rules and regulations.

2. Comprehensive Telcare, LLC and REMN Management LLC (collectively, "Comptel/REMN") were companies with common ownership formed under the laws of Florida, and with their principal places of business in Florida.

3. Company A was a medical staffing firm formed under the laws of Delaware, with its principal place of business in Massachusetts.

## The Medicare Program

4. The Medicare program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily persons who were 65 years of age or older, or persons who were disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through is agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

5. Medicare was a "health care benefit program," as defined by 18 U.S.C. § 24(b), that affects commerce.

6. Medicare was divided into several component "parts" that covered different items and services. For example, Medicare Part B covered certain physician services and outpatient care, including an individual's access to durable medical equipment, as well as cancer genomic testing.

7. Medical providers seeking to bill Medicare for services rendered to beneficiaries were required to enroll with Medicare as a Medicare provider ("provider"). To receive Medicare reimbursement, individual providers had to fill out an application and execute a written provider agreement, known as Form CMS-855I. The application contained certifications that the provider

agreed to "abide by the Medicare laws, regulations, and program instructions that appl[ied] to [them]" and that the provider "[would] not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and [would] not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

8. If Medicare approved a provider's application, Medicare assigned the provider a Medicare "provider number," also known as a National Provider Identifier ("NPI"). A provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

9. Enrolled Medicare providers agreed to abide by the policies, procedures, rules, and regulations governing reimbursement. Providers were given access to Medicare manuals and service bulletins describing procedures, rules, and regulations.

## Durable Medical Equipment

10. Orthotic devices were a type of durable medical equipment ("DME") that included rigid and semi-rigid devices, such as knee braces, back braces, shoulder braces, ankle braces, and wrist braces (collectively, "braces").

11. Medicare reimbursed DME suppliers and other healthcare providers for items and services rendered to beneficiaries. To receive payment

from Medicare, providers submitted or caused to be submitted claims to Medicare electronically, either directly or through a billing company.

12. Medicare claims for DME reimbursement were required to set forth, among other things, the beneficiary's name and unique Medicare identification number, the DME provided to the beneficiary, the date the DME was provided, the cost of the DME, and the name and provider number of the provider who prescribed or ordered the DME.

13. Claims for DME submitted to Medicare qualified for reimbursement only if they were, reasonable, medically necessary for the treatment of the beneficiary's illness or injury, prescribed by a licensed medical professional, documented, and actually provided as represented to Medicare.

<u>Cancer Genomic Testing</u>

14. Cancer genomic ("CGx") testing used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future. CGx testing was not a method of diagnosing whether an individual actually had cancer.

15. Medicare did not cover diagnostic testing that was not "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness,

symptoms, complaint or injury." 42 C.F.R. § 411.15(a)(1). Among the statutory exceptions Medicare covered were cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.*

16. If diagnostic testing were necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. 42 C.F.R. § 410.31(a) provided that all "diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." It further provides that diagnostic tests "not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

17. Because CGx testing did not diagnose cancer, Medicare only covered such tests in limited circumstances, such as when a beneficiary had cancer and the beneficiary's treating medical professional deemed such testing necessary for the treatment of that cancer. Medicare did not cover CGx testing for beneficiaries who did not have cancer or lacked symptoms of cancer.

## Health Care Fraud Count

18. Beginning in or about April 2018, and continuing through in or about March 2019, within the Northern District of Indiana and elsewhere, the defendant,

**LISA GUZMAN**

did knowingly and willfully execute, attempt to execute, and aid and abet the execution of, a scheme and artifice to defraud, and to obtain by means of false and fraudulent pretenses, representations, and promises, money owned by and under the custody and control of Medicare, a health care benefit program as defined in Title 18, United States Code, Section 24(b), in connection with the delivery of and payment for health care services and benefits.

## Purpose of the Scheme to Defraud

19. The purpose of the scheme to defraud was to obtain reimbursement from Medicare through the submission of fraudulent prescriptions for DME and for CGx testing.

## Manner and Means Used to Carry Out the Scheme

20. In or about April 2018, Comptel/REMN and Company A entered into a contract, pursuant to which Company A would provide licensed medical professionals with NPI's for telemedicine consults. Comptel/REMN paid Company A between $40 and $50 per consult.

21. GUZMAN was one of the licensed medical professionals that Company A provided to Comptel/REMN. GUZMAN had a separate contract with Company A, pursuant to which she was paid approximately $15 per consult.

22. From in or about April 2018 and continuing through in or about March 2019, GUZMAN received false and fraudulent orders for DME and CGx testing for Medicare beneficiaries from Comptel/REMN. These orders were pre-filled when GUZMAN received them.

23. GUZMAN knowingly affixed her electronic signature to the pre-filled DME orders referenced in Paragraph 22, by which she falsely certified that, among other things, (1) she established a valid prescriber patient relationship with the patients; (2) her practice conformed to applicable state laws as they relate to the requirements for telemedicine; (3) her recommendations as a treating physician were based on her evaluation of the patients; (4) she performed the assessment of the patient for the prescribed DME; and (5) she verified that the orders were reasonable and medically necessary.

24. GUZMAN knowingly affixed her electronic signature to the pre-filled orders for CGx testing referenced in Paragraph 22, by which she falsely certified that (1) her recommendations as a treating physician were based on her evaluation of the patients; (2) she performed the assessment of the patient

for the prescribed CGx testing; and (3) she verified that the orders were reasonable and medically necessary.

25. GUZMAN caused copies of the false and fraudulent orders referenced in Paragraphs 22 through 24, which bore her electronic signature, to be returned to Comptel/REMN by email.

26. GUZMAN knew that Comptel/REMN would use the signed copies of the false and fraudulent orders to cause DME providers and CGx testing labs to submit false and fraudulent claims to Medicare using GUZMAN's NPI. GUZMAN knew that such claims were not medically necessary, not validly prescribed, and not eligible for reimbursement from Medicare. GUZMAN further knew that those providers would ship DME and CGx test kits to Medicare beneficiaries residing in the Northern District of Indiana and elsewhere.

27. From in or about April 2018 to in or about March 2019, GUZMAN caused the submission of false and fraudulent DME claims to Medicare, under GUZMAN's NPI number in the approximate amount of $4,080,000, of which Medicare paid approximately $1,860,000.

28. From in or about May 2018 to in or about March 2019, GUZMAN caused the submission of false and fraudulent CGx testing claims to Medicare, under GUZMAN's NPI number in the approximate amount of $2,660,000, of which Medicare paid approximately $490,000.

29. Between on or about May 11, 2018 and on or about March 8, 2019, GUZMAN received payments from Company A totaling approximately $38,820. These payments were in exchange for her signing the false and fraudulent orders for DME and for CGx testing for Medicare beneficiaries, referenced in Paragraphs 22 through 24, that were not medically necessary and not eligible for Medicare reimbursement.

**Examples of Fraudulent Prescriptions**

Patient P.S.

30. On or about January 11, 2019, GUZMAN received two pre-filled false and fraudulent DME orders for beneficiary P.S., a resident of southern Indiana. On the same date, approximately 186 seconds after opening them, GUZMAN affixed her electronic signature to the DME orders. By doing so, GUZMAN caused an electronic copy of the fraudulently-signed DME orders to be returned to Comptel/REMN.

31. One of the false and fraudulent DME orders for beneficiary P.S. included an order for a left leg orthosis. Beneficiary P.S., however, had her left leg amputated below the knee in or about March 2017.

32. On or about January 17, 2019, claim number 19017801320000 was filed with Medicare, seeking approximately $1,453.45 for DME prescribed to beneficiary P.S. under GUZMAN's NPI. On or about January 19, 2019, Medicare paid the claimant approximately $994.47.

Patient H.B.

33. On or about January 7, 2019, GUZMAN received two pre-filled false and fraudulent DME orders for beneficiary H.B., a resident of southern Indiana. On the same date, approximately 23 seconds after opening them, GUZMAN affixed her electronic signature to the DME orders. By doing so, GUZMAN caused an electronic copy of the fraudulently-signed DME orders to be returned to Comptel/REMN.

34. On or about December 7, 2018, beneficiary H.B. died.

35. On or about January 10, 2019, claim number 19014814735000 was filed with Medicare, seeking $1,482.92 for DME prescribed to beneficiary H.B. under GUZMAN's NPI. Medicare denied payment to the claimant because beneficiary H.B. was deceased.

Patient M.P.

36. On or about January 4, 2019, GUZMAN received two pre-filled false and fraudulent DME orders for beneficiary M.P., a resident of southern Indiana. On the same date, approximately 23 seconds after opening them, GUZMAN affixed her electronic signature to the DME orders. By doing so, GUZMAN caused an electronic copy of the fraudulently-signed DME orders to be returned to Comptel/REMN.

37. On or about January 3, 2019, beneficiary M.P. died.

38. On or about January 8, 2019, claim number 19009800355000 was filed with Medicare, seeking approximately $1,978.64 for the DME prescribed to beneficiary M.P. under GUZMAN's NPI. Medicare denied payment to the claimant because beneficiary M.P. was deceased.

Patient F.R.

39. On or about August 21, 2018, GUZMAN received one pre-filled false and fraudulent CGx order for beneficiary F.R., a resident of Nevada. On the same date, approximately 30 seconds after opening it, GUZMAN affixed her electronic signature to the CGx order. By doing so, GUZMAN caused an electronic copy of the fraudulently-signed CGx order to be returned to Comptel/REMN.

40. On or about January 7, 2019, claim number 531118261419810 was filed with Medicare, seeking approximately $23,698.00 for the CGx testing prescribed to beneficiary F.R. under GUZMAN's NPI. On or about January 12, 2019, Medicare paid the claimant approximately $4,026.91.

Patient B.K.

41. On or about May 9, 2018, GUZMAN received one pre-filled false and fraudulent CGx order for beneficiary B.K., a resident of central Illinois. On the same date, approximately 23 seconds after opening it, GUZMAN affixed her electronic signature to the CGx order. By doing so, GUZMAN caused an

electronic copy of the fraudulently-signed CGx order to be returned to Comptel/REMN.

42. On or about December 11, 2018, claim number 531118176249420 was filed with Medicare, seeking approximately $19,768.00 for the CGx testing prescribed to beneficiary B.K. under GUZMAN's NPI. On or about December 16, 2018, Medicare paid the claimant approximately $5,950.39.

Patient G.P.

43. On or about May 30, 2018, GUZMAN received one pre-filled false and fraudulent CGx order for beneficiary G.P., a resident of Nevada. On the same date, approximately 26 seconds after opening it, GUZMAN affixed her electronic signature to the CGx order. By doing so, GUZMAN caused an electronic copy of the fraudulently-signed CGx order to be returned to Comptel/REMN

44. On or about January 7, 2019, claim number 531118191316590 was filed with Medicare, seeking approximately $12,580.00 for the CGx testing prescribed to beneficiary G.P. under GUZMAN's NPI. On or about January 11, 2019, Medicare paid the claimant approximately $2,468.33.

45. GUZMAN knew that each of the orders described in Paragraphs 30 through 44 were false and fraudulent because, among other things, GUZMAN neither established a patient-provider relationship with nor acted as the treating physician for the beneficiaries listed therein. GUZMAN further

knew that false and fraudulent claims would be submitted to Medicare as a direct result of her returning signed copies of the orders described in Paragraphs 30 through 44 to Comptel/REMN.

All in violation of 18 U.S.C. §§ 1347 and 2.

## FORFEITURE ALLEGATIONS

1. The allegations contained in this Indictment are hereby realleged and fully incorporated by reference for the purpose of alleging forfeiture to the United States of America pursuant to Title 18, United States Code, Section 982(a)(7).

2. Upon conviction of offenses in violation of Title 18, United States Code, Section 1347, alleged in the Indictment, the defendant LISA GUZMAN shall forfeit to the United States of America pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses.

3. Upon conviction of the offense set forth in the Indictment, the the United States will seek a money judgment in the amount of the proceeds received by the defendant that is traceable to the offenses.

4. If any of the property described above, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the court;

   d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

**A TRUE BILL**

/s/ Foreperson
FOREPERSON

CLIFFORD D. JOHNSON
United States Attorney

By: /s/ Francis Sohn
FRANCIS SOHN
Assistant United States Attorney